AUTOMOBILE INSURANCE CO. OF HARTFORD, CONN., *v.*
COCHRAN.

CARRIERS—TRUCKING COMPANY—LIABILITY FOR DAMAGE TO GOODS IN
TRANSIT.

> Judgment against trucking company for damage to goods in transit, based on finding that it was doing business as common carrier, is reversed, on appeal, where it appears that it was not common carrier.

Appeal from Superior Court of Grand Rapids; Verdier (Leonard D.), J., presiding.   Submitted January 11, 1933.   (Docket No. 92, Calendar No. 36,994.)   Decided April 4, 1933.   Rehearing denied May 16, 1933.

Action by Automobile Insurance Company of Hartford, Connecticut, as assignee, against Fred Cochran, doing business as City Transfer & Storage Company, for damage to a load of freight alleged to have been carried by defendant as a common carrier. Judgment for plaintiff. Defendant appeals. Reversed, and judgment ordered entered for defendant.

*Travis, Merrick, Johnson & McCobb,* for plaintiff.

*Mason, Alexander, McCaslin, Cholette & Mitts,* for defendant.

Sharpe, J. William A. Schlientz, Jr., engaged in business as a common carrier at Grand Rapids, under the name of Verkler Motor Express, secured an order for the shipment of goods from the Grand Rapids Store Equipment Corporation to Kresge's store at Harvey, Illinois. These goods (counters and store equipment) were shipped under a uniform bill of lading; the rates being fixed by the official classification "made by the committee on railroads of the United States." The Verkler Motor Express did not have sufficient equipment to handle the shipment, and Harry Willard, its traffic representative, got into communication with Lee D. Laraway, the office manager of Fred Cochran, doing business as City Transfer & Storage Company, the defendant, and asked if his company would take a load of the counters to Chicago for the Verkler company. Laraway fixed the price for the service at $50, and this was assented to by Willard.

Willard later informed Laraway that the load was ready to move, and Laraway sent a truck, consisting of a tractor and a long body trailer, to the

warehouse of the equipment company for loading. Harold Beunk was in charge thereof. Willard assisted Beunk in the loading, and Beunk claims he protested against the putting of a third tier of crates on the truck, but was assured by Willard that it was all right to do so. Willard indicated to Beunk the best route to take to reach Chicago. Beunk drove the truck back to defendant's yards, and, being unable to make the trip himself, called another employee, Clarence Barrett, to do so.

While *en route* the truck tipped over, and the goods were damaged to the extent of $1,277.40. The Verkler company carried insurance on goods thus transported with the plaintiff company. It paid the loss to the equipment company, and secured a release to the Verkler company therefor and also a subrogation receipt for all rights of recovery against the defendant on account of said loss. It thereupon brought this action, and, on trial by the court without a jury, was awarded a judgment for the amount above stated, from which the defendant seeks review by appeal.

The liability of the defendant was predicated upon the fact that it was engaged in business as a common carrier. The trial court so found. In this the defendant claims he was in error. Plaintiff's counsel rely on the testimony of Mr. Laraway to support this finding.

He testified on direct examination:

"The company maintains storage of goods at their place, and a trucking business. The larger part of it is trucking. At the time of the accident they had eight trucks, all owned by the company.

"The company did not maintain any definite route between any definite points; they did not op-

erate trucks at that time on any set schedule; they did not advertise or hold out to the public that they operated trucks between definite points at definite times. They obtained their business by people calling the company and asking them to do certain jobs. The terms under which each particular job was done would be arranged at the time that the parties called, and if they got together, then they would do the job. Each trip would be a trip that they would figure on with the party calling. If it were not for the party calling and requesting them to make the trip the trucks would not have been making the trip.

"They did not take all of the jobs that were presented. It would depend more or less on the price and whether or not we would be able to handle it. * * * It has never been our custom in making a trip to Kalamazoo, Chicago, or any other place, to solicit business at the other end of return freight. The price for making these trips in hauling goods for definite parties was arranged at the city before we left on the trip, and was arranged for the whole trip, and when goods were to be returned arrangements were made to include the goods to be returned. In one load we would never carry goods for more than one person. On some occasions when we were making a trip for one person to a certain point if another person had goods coming back from that point we would make arrangements to bring the goods back with the other person."

And on cross-examination:

"*Q.* You were in the general trucking and hauling business?

"*A.* Yes, sir.

"*The Court:* *Q.* Did you do business for anybody that applied, as long as you could agree on the terms?

"*A.* Yes.

"*Q*. And as long as you had trucks to handle them?

"*A*. If we got a call to make a trip and the price could be agreed upon.

"*Q*. You would do it for anybody that terms were satisfactory?

"*A*. Yes, sir.

"*Mr. Riddering*:    *Q*. And you would drive anywhere within reason that the company wanted you to drive, would you?

"*A*. Yes, sir. ,

"*Q*. You had no limits as to distance?

"*A*. No.

"*Q*. Nor routes?

"*A*. No.

"*Q*. But any person who would call you and pay the price you asked to get their goods carried by you?

"*A*. In case we had the equipment.

"*Q*. If you had the equipment available at that time?

"*A*. Yes, sir.

"*Q*. It wouldn't make any difference to you whether or not you had ever carried any goods for this particular person or knew that he was a good risk so far as payment was concerned?

"*A*. We would make the trip.

"*Q*. You would make the trip?

"*A*. Yes, sir.

"*Q*. A perfect stranger might come in and if he would offer you payment in advance you would carry the load?

"*A*. Yes, sir.

"*Q*. So that as far as you had facilities and as long as you had trucks that were not on the road, you were ready to carry for anyone who could pay your price?

"*A*. Yes, sir.''

A somewhat similar question was presented in *Re Border Cities Trucking Co.,* 261 Mich. 385, and in *Re Columbian Storage, etc., Co.,* 261 Mich. 390. In the first of these cases, the statute (Act No. 312, Pub. Acts 1931), providing for the classification and regulation of carriers for hire, was construed and the distinction between a public carrier and a private carrier pointed out. It was there said of an applicant for a permit as a private carrier:

"He has and exercises the right to take what freight he chooses. His business is upon the principle of profit to himself, not upon obligation to the public as a public carrier. * * * He has preserved his right to discriminate."

In *Michigan Public Utilities Co.* v. *Duke,* 266 U. S. 570 (45 Sup. Ct. 191, 36 A. L. R. 1105), the court said:

"One bound to furnish transportation to the public as a common carrier must serve all, up to the capacity of his facilities, without discrimination and for reasonable pay."

The distinction is pointed out in 4 R. C. L. pp. 549, 550, as follows:

"The authorities recognize two classes of carriers, *viz.,* private carriers and common carriers. All persons who undertake for hire, to carry the goods of another, belong to one or the other of these classes. * * * The former are not bound to carry for any reason unless they enter into a special agreement to do so. The latter are bound to carry for all who offer such goods as they are accustomed to carry and tender reasonable compensation for carrying them; and if they refuse to perform their obligation in this respect, they are liable to respond in damages."

While some confusion may have arisen in the discussion of this question in certain of our cases, owing to the language used not being strictly confined to the facts presented, it seems clear that the defendant at the time of the transaction in question was not engaged in business as a common carrier.

The judgment is reversed and set aside, and the cause remanded, with directions to enter a judgment for the defendant, with costs of both courts.

McDONALD, C. J., and CLARK, POTTER, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.